IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| REBECCA ARNOLD, | ) | |
| | ) | Case No. CV-05-309-S-BLW |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM** |
| v. | ) | **DECISION AND ORDER** |
| | ) | |
| ALBERTSON'S, INC., a | ) | |
| Delaware corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Currently pending before the Court is Defendant's motion for summary

judgment on all of Plaintiff's claims (Docket No. 19).  The Court heard oral

argument on the motion on October 31, 2006.  After the hearing, Defendant sought

to expand the record to include documents referenced in two affidavits.  *See* Motion

to Amend (Docket No. 45).

For the following reasons, the court shall deny the motion to amend (Docket

No. 45) and grant in part and deny in part the motion for summary judgment

(Docket No. 19).

**Facts**

The following facts are derived from the documents submitted by the parties,

**Memorandum Decision and Order – Page 1**

are interpreted in the light most favorable to the plaintiff, and are undisputed except where noted.

Rebecca Arnold, an attorney in Albertson's Real Estate Department was terminated by Albertson's in October 2003. She filed suit against her former employer in state court in July 2004, asserting six federal and state claims. Albertson's removed the case to federal court and, after discovery, moved for summary judgment on all of Arnold's claims. Arnold opposes the motion. Although the facts underlying Arnold's claims overlap in part, for clarity's sake, the Court will segregate them into categories to the extent possible.

### A.    Allegations regarding sexual harassment

Arnold's complaint alleges that she endured a hostile work environment for the nine years she worked at Albertson's and that Albertson's fired her in retaliation for complaining about the harassment she had experienced.[1] She alleges that an attorney, Lee Mumford, sexually harassed her, made inappropriate comments, and retaliated against her when she complained of gender issues. Initially, she and Mumford were peers. However, in 1998, Albertson's promoted him to a supervisory position and he supervised Arnold for several years. Albertson's then

---

[1]        Complaint, Docket No. 1 at 8.

**Memorandum Decision and Order – Page 2**

promoted Mumford to Vice President.  In that position, he apparently oversaw Arnold and her direct supervisor, Joel Guth.[2]

According to the evidence in the record, some time around 1998 – the precise date is unclear[3] – Mumford forced physical contact with Plaintiff at an after-work social event at the Piper Pub and on the ride home – putting his hand on her legs, kissing her, touching her between the legs, and repeatedly pressuring her to get a hotel room with him.[4]  She rejected his advances.[5]  At work over the next several years, Arnold asserts that Mumford, while still her supervisor, commented on her appearance, told dirty jokes in her presence, discussed sex, discussed Albertson's coverage of his Viagra prescription, pressured her to set him up with other women, and refused to acknowledge her outstanding performance on a project in retaliation

----

[2]     Albertson's disputes Arnold's assertion that Mumford supervised her after Albertson's promoted him to Vice President.  However, Albertson's does not dispute that Mumford investigated and critiqued her performance while she was on leave and drafted a letter setting forth alleged performance problems.  Accordingly, the Court concludes that Mumford maintained some sort of a supervisory role over Arnold even after Albertson's placed him in the position of Vice President.

[3]     *See* Dep. of Rebecca Arnold, Docket No. 19, Attach. 2 at 84 (suggesting 1998 or 2000); Investigation Report of Randall Ferris, Docket No. 19, Attach. 9 at 10 (suggesting 1997).

[4]     *See* Investigation Report of Randall Ferris, Docket No. 19, Attach. 9 at 1–2.

[5]     *Id.*

**Memorandum Decision and Order – Page 3**

for her unrelated complaint of gender discrimination.[6]  Finally, she alleges that in 2003, he made inappropriate comments and again initiated physical contact, rubbing against her buttocks after approaching her from behind while she was in the copy room.[7]

Although Arnold asserts that Mumford's behavior was primarily responsible for creating the hostile environment in which she worked, she asserts that Albertson's contributed to the hostility in other ways as well.  She testified that rumors regarding sexual harassment and relationships among superiors and employees, her own experience after reporting harassment of her secretary, and her experience after complaining of a pay equity issue, all contributed to the hostile work environment and discouraged her from reporting anything to her employer. Specifically, a fellow employee warned her of a man known for sexual harassment about whom various complaints had been made but to no effect.[8]  Rumors that the CEO had an affair with a subordinate circulated around the company at one point. Arnold testified that Mumford once said that, in light of the CEO's behavior, "It

---

[6]     Aff. of Rebecca Arnold, Docket No. 19, Attach. 2 at 65–66, 108, 121, 173–74; Attach. 3 at 247; Investigation Report of Randall Ferris, Docket No. 19, Attach. 9 at 11.

[7]     Dep. of Rebecca Arnold, Docket No. 19, Attach. 2 at 65–66, 121.

[8]     *Id.* at 67–68.

**Memorandum Decision and Order – Page 4**

was open season on [women] around here."[9]  Additionally, after reporting an

attorney for harassing her secretary, Arnold learned that he had made up lies about

her in an effort to get her in trouble with her supervisors.[10]  Although her supervisors

investigated the attorney's allegations and concluded that they were lies, they never

disciplined the attorney.[11]  Finally, Arnold asserts that Mumford declined to

commend her for success on a project, citing her unrelated complaint regarding pay

equity.[12]

Arnold complained to an Albertson's Vice President, Dave McKinney, of

Mumford's harassment in September 2003.[13]  She officially complained to

Albertson's on October 3, 2003.  She was fired on October 10, 2003.  She alleges

that Albertson's fired her in retaliation for her complaint.[14]

Arnold experienced a recurrence of post traumatic stress disorder, suffered

---

[9]     Aff. of Rebecca Arnold, Docket No. 24 at 4.  Albertson's objected to this portion of Arnold's affidavit.

[10]    Dep. of Rebecca Arnold, Docket No. 19, Attach. 2 at 122–23, 175–76.

[11]    *Id.*

[12]    Dep. of Rebecca Arnold, Docket No. 19, Attach. 3 at 247.

[13]    Dep. of Rebecca Arnold, Docket No. 19, Attach. 2 at 174.  Arnold testified that she told McKinney to keep her complaint secret.

[14]    Complaint, Docket No. 1 at 20.

**Memorandum Decision and Order – Page 5**

from increased insomnia, and had nightmares after the Piper Pub incident and throughout her employment at Albertson's.[15]  The nightmares related both to Mumford's unwanted physical contact and to childhood incidents of sexual abuse.[16] After Mumford's physical contact with her in the copy room, she testified that she could not go on and that she had to take leave.[17]

### B.   Allegations regarding disability/perceived disability and FMLA leave

Arnold provided Albertson's with physicians' letters documenting diagnoses of depression, post traumatic stress disorder, and insomnia in May 2003, prior to taking leave under the Family Medical Leave Act (FMLA).[18]  She asserts that Albertson's terminated her because these problems rendered her disabled, caused Albertson's to perceive her as disabled, and/or caused her to require leave. She therefore asserts that the defendant wrongfully terminated her employment[19] and violated the American's with Disabilities Act (ADA),[20] the Idaho Human Rights Act

---

[15]   Dep. of Rebecca Arnold, Docket No. 19, Attach. 2 at 82–83, 132.

[16]   *Id.* at 83.

[17]   *Id.* at 80, 90.

[18]   Dep. of Rebecca Arnold, Docket No. 19, Attach. 2 at 80.

[19]   Complaint, Docket No. 1 at 5–6.

[20]   *Id.* at 16–17.

**Memorandum Decision and Order – Page 6**

(IHRA),[21] the FMLA, and the implied covenant of good faith and fair dealing.[22]

As described above, Arnold took FMLA leave after the copy room incident. She requested the leave in May 2003, to be effective immediately.[23]  During her leave, Mumford called her twice.  The first time, he called with her direct supervisor, Joel Guth.  They asked about the status of various projects.[24]  The second time, he called her on his own.  He was "angry [and] wanted to know what was wrong with [her] and when [she] was coming back to work."[25]

When Arnold returned to work in August of 2003, she presented physicians' letters seeking several accommodations.[26]  Specifically, she requested a later start time, a six-hour work day, and an office with natural light.[27]  It is undisputed that Albertson's gave her a later start time.  With respect to the other requests, Arnold testified that Albertson's said it would accommodate her, but never effectively did

---

[21]     *Id.*

[22]     *Id.* at 18–19.

[23]     Dep. of Rebecca Arnold, Docket No. 19, Attach. 2 at 80, 90–91.

[24]     *Id.* at 99–100.

[25]     *Id.* at 101–02.

[26]     *Id.* at 127–29.

[27]     *Id.* at 134.

**Memorandum Decision and Order – Page 7**

so in the two months before Albertson's terminated her employment.[28]

### C.    Alleged performance issues

There is no dispute that Arnold's supervisors had raised issues of responsiveness with Arnold on and off throughout her employment.[29]  Moreover, there is no dispute that Bill Arnold, the head of her department, consistently ranked her at the bottom of the department since the Spring of 2002.  However, there is also no dispute that Arnold received positive reviews as well.[30]  Arnold and Albertson's sharply dispute whether her performance before her termination was satisfactory.  They also disagree regarding the probative value of Bill Arnold's rankings.

Arnold received a positive performance review at the end of April 2003, with descriptions ranging from "meets expectations" to "outstanding."[31]  According to Albertson's, various problems came to light after this evaluation, while Arnold was on FMLA leave.  During her leave, Mumford initiated an investigation and wrote a

---

[28]      *Id.* at 137, 140.

[29]      *Id.* at 55–57.

[30]      Aff. of Rebecca Arnold, Docket No. 19, Attach. 9 at 5, 8; Dep.of Rebecca Arnold, Docket No. 19, Attach. 3 at 246.

[31]      Aff. of Rebecca Arnold, Docket No. 19, Attach. 9 at 8.

**Memorandum Decision and Order – Page 8**

letter[32] that he and her other superiors signed.  It described two alleged problems with her performance.[33]  First, the letter stated that she had not paid rent on a Fuel Center Store, # 4423, for which she was responsible.[34]  Second, the letter stated that she had not responded to a developer's requests regarding another store, # 7179, before her leave and that management had found it necessary to reassign responsibility for the store because the developer was so frustrated with her.[35]

With respect to the first issue, Arnold acknowledges that she did not pay rent, but asserts that not paying rent was part of a strategy to force the resolution of other issues Albertson's had with the landlord of Fuel Center Store # 4423.[36]  According to her testimony, the real estate manager had specifically directed her not to pay rent in light of the strategy.[37]  Furthermore, she asserts that an investigation of telephone logs revealed that she had responded to requests and inquiries regarding the store.[38]

---

[32]    *See* Pl.'s Statement of Disputed Facts, Docket No. 29 at 5.

[33]    *See* Letter, Docket No. 26, Attach. 1 at 2–3.

[34]    *Id.* at 2.

[35]    *Id.*

[36]    Dep. of Rebecca Arnold, Docket No. 19, Attach. 3 at 189–90.

[37]    *Id.*

[38]    *Id.*

**Memorandum Decision and Order – Page 9**

She denies the second allegation in the letter.  She asserts that Dave McKinney,

another Albertson's Vice President, told her the second store had been reassigned

simply because someone needed to handle it while she was away on leave.[39]

Arnold thus asserts that her performance was satisfactory and that Mumford

trumped up the complaints to retaliate against her and build a case for terminating

her employment.

Also during Arnold's leave, Bill Arnold ranked her last out of all the attorneys

in the section.[40]  Arnold contends, and Albertson's admits, that the rankings were

subjective.  In and of itself, subjectivity shows little.  Arnold does not complain that

Bill Arnold harbored animus towards her or discriminated against her.  However,

Bill Arnold admitted that he consulted others when he evaluated individual's

performance for the rankings.[41] Arnold thus asserts that the subjective nature of the

rankings, coupled with Bill Arnold's admission that he consulted others, suggests

that Mumford influenced the rankings.  In light of Mumford's investigation of her

---

[39]     Aff. of Rebecca Arnold, Docket No. 24 at 5.

[40]     *See* Def.'s Stmt. of Undisputed Facts, Docket No. 19, Attach. 1 at 2–3;
Pl.'s Statement of Disputed Facts, Docket No. 29 at 7.

[41]     *See* Dep. of Bill Arnold, Docket No. 19, Attach. 7 at 16; Decl. of Bill
Arnold, Docket No. 21 at 2.  The Court assumes that counsel's assertion to the
contrary during the hearing was a simple mistake regarding the facts.

**Memorandum Decision and Order – Page 10**

performance and drafting of the performance letter during her leave, that seems to be a reasonable inference.[42]

### D.    Termination

Albertson's terminated Arnold's employment on October 10, 2003 as part of a reduction in force.  The parties dispute the timing and motivation of Albertson's decision to include Arnold in the reduction in force.  As to timing, Albertson's argues that it selected Arnold well before her complaint of harassment.  It points to a declaration of John Nieman, a Human Resources officer, stating that Arnold was identified "throughout the r[eduction] i[n] f[orce] process" as an attorney to be terminated[43] and to a similar declaration by Bill Arnold.[44]  The declarations both refer to documents that were not filed with the Court and are not part of the record.[45]  These documents are the subject of a belated motion, filed after the

---

[42]    The inference with respect to the earlier rankings may be weaker, at least during the time when Mumford was not directly supervising and evaluating Arnold.

[43]    *See* Defendant's Statement of Undisputed Facts, Docket No. 19, Attach. 1 at 3 (citing Dec. of John Nieman, Docket No. 22 at 2).  It is unclear when that process began.  However, the parties seem to agree that it began before Arnold's complaint of sexual harassment.

[44]    *See* Dec. of William Arnold, Docket No. 21 at 2.

[45]    *Id.*

**Memorandum Decision and Order – Page 11**

hearing on the summary judgment motion, to expand the record.[46]

Arnold asserts that Albertson's decided to include her in the reduction in force only after she complained.  To support her assertion, she points to a document dated October 8, 2003 and labeled "Albertson's, Inc. Confidential."[47]  It  lists the attorneys in the real estate department by age and position title and indicates whether they were or were not selected for the reduction in force.  The document indicates that the only 46 year old attorney with an "Attorney III" title was *not* selected.[48]  It is undisputed that Arnold was 46 and that she held an "Attorney III" title at the time.  Thus, Arnold asserts that the document clearly refers to her as not selected.[49]

Albertson's asserts that its motivation for including Arnold in the reduction in force stemmed from her low ranking, which reflected poor performance before the reduction in force, and her uneven performance in previous years.  Arnold asserts that the rankings were tainted because they were based on subjective criteria[50] that

---

[46]     *See* Motion to Amend (Docket No. 45).

[47]     OWBPA List, Docket No. 24, Attach. 1 at 2.

[48]     *Id.*

[49]     *Id.*

[50]     *See* Dep. of Bill Arnold, Docket No. 19, Attach. 7 at 16.

**Memorandum Decision and Order – Page 12**

Mumford was allowed to influence.[51]  She also notes that some of her lowest

rankings occurred after Albertson's received her doctors' letters containing her

diagnoses and while she was not even working, but on FMLA leave.[52]  Thus,

disputes exist over both the timing and the motivation of Albertson's decision to

include Arnold in the reduction in force.

### Standards

Federal Rule of Civil Procedure 56(c) permits summary judgment if no

genuine issue exists as to any material fact and the moving party is entitled to

judgment as a matter of law.[53]  The moving party must show the absence of an issue

of material fact.[54]  Once the moving party does so, the non-moving party must go

beyond the pleadings and designate specific facts showing a genuine issue for trial.[55]

The court must "not weigh the evidence or determine the truth of the matter, but

---

[51]     *Id.* at 54.  As discussed above, Bill Arnold testified that he consulted others when ranking his employees and it is clear that Mumford was actively investigating and evaluating Arnold's performance while she was on leave.

[52]     *See* Pl.'s Statement of Disputed Facts, Docket No. 29 at 7.

[53]     FED. R. CIV. P. 56(c).

[54]     *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[55]     *Id.* at 324.

**Memorandum Decision and Order – Page 13**

only determine[ ] whether there is a genuine issue for trial."[56]  The court must view

the inferences drawn from the facts in the light most favorable to the non-moving

party.[57]  Thus, reasonable doubts as to the existence of a factual issue should be

resolved against the moving party.[58]

### Discussion

### A.    Late Motion to Expand the Record

Before addressing the summary judgment motion, the Court will address

Albertson's belated motion to amend the record (Docket No. 45).  The Court denies

that motion.  It would unfair and impractical to reopen the record at this late date.

The scheduling order in this matter was very clear and the Court already extended

the dispositive motion deadline once.[59]  As the party moving for summary judgment,

Albertson's bore the initial burden.[60]  Although the Court understands that the

failure to file the documents to which the affidavits referred was a mistake on

---

[56]     *Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999).

[57]     *Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110,
1131 (9th Cir. 2003).

[58]     *T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626,
631 (9th Cir. 1987).

[59]     *See* Docket Nos. 11 and 16.

[60]     *Celotex*, 477 U.S. at 323.

**Memorandum Decision and Order – Page 14**

counsel's part, the fact remains that Albertson's did not file the documents on time. Albertson's assertions that the plaintiff will not be prejudiced by allowing Albertson's to introduce the documents now – after briefing and argument are complete – ring hollow.  The plaintiff did not respond to the documents in its responsive briefing because they were not part of the record.  Asking the plaintiff to do so now would be unfair.  Accordingly, the Court declines Albertson's invitation to reopen the record and denies its motion (Docket No. 45).

### B.    Summary Judgment Motion

Albertson's moved for summary judgment on all of Arnold's claims.  Arnold did not rebut Albertson's arguments regarding that part of her wrongful discharge claim alleging age discrimination  –  part of Count II.  She also did not directly rebut its arguments regarding her independent FMLA claim – Count V of the Complaint. The Court concludes that Albertson's has satisfied its burden with respect to that part of Count II involving age discrimination and the Court will therefore grant summary judgment as to that part of the claim.

The Court concludes that Albertson's has not satisfied its burden with respect to the FMLA claim.[61]  Pursuant to governing federal regulations, an employer

---

[61]    *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *United Steelworkers of Amer. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542–43 (9th Cir.

**Memorandum Decision and Order – Page 15**

violates the FMLA by subjecting an employee to "negative consequences" because the employee "has used FMLA leave."[62]  If Arnold's "taking of FMLA leave constituted a negative factor in the decision to terminate her" employment, then, Albertson's violated the FMLA.[63]  Although Albertson's points to evidence that a jury could use to conclude that something besides Arnold's leave motivated Albertson's decision – performance problems that came to light during her leave – evidence in the record would allow a reasonable jury to conclude that the leave *did* affect Albertson's decision.  Specifically, Arnold has called into question the validity of the performance issues Albertson's raised upon her return for leave,[64] has pointed to evidence suggesting that her leave angered Mumford, a Vice President in her department,[65] and has pointed out that Albertson's apparently decided to terminate her employment either around the time of her leave (if the jury agrees with

---

1989) (discussing burden of moving party on summary judgment).

[62]   *See* 29 C.F.R. § 825.220(a)(1).

[63]   *See Lui v. Amway Corp.*, 347 F.3d 1125, 1136 (9th Cir. 2003).

[64]   *See* Dep. of Rebecca Arnold, Docket No. 19, Attach. 3 at 189–90.

[65]   *See* Dep. of Rebecca Arnold, Docket No. 19, Attach. 3 at 101–02.

**Memorandum Decision and Order – Page 16**

Albertson's account)[66] or shortly thereafter (if the jury agrees with her account).[67] Accordingly, even though Arnold does not specifically defend her FMLA claim, the Court must nonetheless deny summary judgment on Count V.   Albertson's simply has not satisfied its initial burden with respect to that claim.

### A.    Title VII and IHRA Claims: Count VI of the Complaint

#### 1.    Hostile Work Environment

Arnold alleges that Albertson's created a hostile work environment[68] and retaliated against her for reporting harassment in violation of Title VII[69] and the

---

[66]    *See* Def.'s Statement of Undisputed Facts, Docket No. 19, Attach. 1 at 3.

[67]    *See* Plaintiff's Resp. to Def.'s Motion, Docket No. 23 at 7.

[68]    *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (noting that the phrase "terms, conditions, or privileges of employment" under Title VII, "evinces a congressional intent to strike at the entire spectrum of disparate treatment" in employment, "which includes requiring people to work in a discriminatorily hostile or abusive environment") (internal quotations omitted); *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000) ("In order to prevail on [a] hostile work environment claim, [the plaintiff] must show that her workplace was permeated with discriminatory intimidation . . . that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.") (internal quotation marks omitted).

[69]    42 U.S.C. § 2000e-2(a)(1) (providing that it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex").

**Memorandum Decision and Order – Page 17**

IHRA.[70]  She argues that Mumford, as he rose from line attorney to supervisor to a
Vice President in Arnold's department, created the hostile work environment by
sexually harassing her and engaging in other inappropriate behavior.[71]  Albertson's
further fostered the hostile work environment by handling complaints regarding
sexual harassment and gender discrimination poorly, allowing fellow employees to
retaliate against those who complained,[72] and actually retaliating against her when
she raised an issue of pay equity with management.[73]

　　　Albertson's argues that Arnold's hostile work environment claim is untimely
because the last incident involving sexual harassment by Mumford occurred outside
the statutory period, in May 2003.  Arnold acknowledges that event took place
outside the statutory period, but argues that Albertson's created the hostile work
environment through more than Mumford's actions.  Specifically, she argues that

---

[70]　　IDAHO CODE 67-5909(1) (2005) (providing that it is unlawful for an
employer to "fail or refuse to hire, to discharge, or otherwise discriminate against an
individual with respect to compensation or the terms, conditions or privileges of
employment" on the basis of sex).  Precedent governing Title VII also governs the
IHRA. *See Hoppe v. McDonald*, 644 P.2d 355, 358 (Id. 1982).  Accordingly, the
two claims will be treated as one.

[71]　　*See* Dep. of Rebecca Arnold, Docket No. 19, Attach. 2 at 67–68.

[72]　　*Id.* at 122–23, 175–76.

[73]　　*See* Dep. of Rebecca Arnold, Docket No. 19, Attach. 3 at 247.

**Memorandum Decision and Order – Page 18**

Albertson's decision to terminate her employment was part of the hostile work environment.

Drawing all inferences in the light most favorable to Arnold, and therefore assuming that Albertson's did not decide to include her in the reduction in force until after she complained, the timing of Albertson's decision to terminate Arnold's employment directly supports a retaliation claim.[74]  However, under current Ninth Circuit law, the allegedly retaliatory termination may be considered only as *background* for the hostile work environment claim.[75]  As a separately-actionable, "discrete act," it cannot be an event contributing to the hostile work environment for statute of limitations purposes.[76]  Accordingly, the Court will grant Albertson's summary judgment motion on that part of Count VI that states a claim for a hostile work environment.  The statute of limitations bars the claim.

## 2.    Retaliation

Albertson's argues for summary judgment on Arnold's retaliation claim by

---

[74]      *See Liu*, 347 F.3d at 1137.

[75]      See *Porter v. California Dept. Of Corrections,* 419 F.3d 885, 893–94 (9th Cir. 2005)

[76]      *Id.* (noting that discrete, independently-actionable acts can provide context for hostile work environment claims, but non-discrete acts contributing to a hostile work environment must occur within the statutory period).

**Memorandum Decision and Order – Page 19**

pointing to Bill Arnold's low rankings of her immediately before the reduction in force, her uneven performance over the years, and declarations that state that she was selected throughout the RIF process.  The declarations to which Albertson's points, however, refer to documents that were not made part of the record. [77] Moreover, Arnold has introduced a document dated October 8 that indicates that the only person her age in her position (Attorney III) was *not* selected for the reduction in force.[78]  Based on the evidence currently on the record, a reasonable jury could conclude that Albertson's was not going to terminate Arnold – despite her low rankings – until the last minute, *after* she complained of sexual harassment.  Thus, regardless of any alleged problems with the rankings, the October 8th document creates a genuine issue of material fact regarding the timing of and motive behind Albertson's decision to include Arnold in the reduction in force.  The Court therefore denies Albertson's motion for summary judgment on Arnold's retaliation claim  – the remainder of Count VI.

### B.    ADA/IHRA Claim

Arnold asserts that Albertson's terminated her employment because she was

---

[77]     *See* Dec. of John Nieman, Docket No. 22 at 2; Dec. of William Arnold, Docket No. 21 at 2.

[78]     OWBPA List, Docket No. 24, Attach. 1 at 2.

**Memorandum Decision and Order – Page 20**

disabled or because they believed she was disabled, based on the diagnoses she had provided prior to taking leave.  To establish a prima facie claim under the ADA, Plaintiff must show that she was a qualified person with a disability and that she suffered an adverse employment action due to that disability.[79]  Notably, Albertson's does not argue that the Plaintiff is not disabled.  Rather, Albertson's argues that Arnold never notified Albertson's that she met the ADA's definition of a disabled person and that the Court should therefore grant summary judgment.[80]  This argument fails.  Certainly, employees bear the ultimate burden of establishing that they are covered by the ADA[81] and employers cannot accommodate disabilities about which they know nothing.[82]  However, employees do not have to use "magic words" in order to trigger employer responsibilities under the ADA.[83]  Requesting accommodations and citing a medical condition necessitating them triggers an

---

[79]     *Cooper v. Neiman Marcus Group*, 125 F.3d 786, 790 (9th Cir. 1997).

[80]     Mem. In Support of Motion, Docket No. 19, Attach. 1 at 2–3.

[81]     *See Thornton v. McClatchy Newspapers, Inc.*, 261 F.3d 789, 794 (9th Cir. 2001).

[82]     *See* Mem. In Support of Motion, Docket No. 19, Attach. 1 at 2–3 (citing out-of-Circuit cases).

[83]     EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, ENFORCEMENT GUIDANCE ON THE ADA AND PSYCHOLOGICAL DISABILITY, NO. 915.002 (MARCH 25, 1997) AT 18.

**Memorandum Decision and Order – Page 21**

employer's responsibility – at a minimum – to inquire further.[84]  Albertson's

acknowledges that Arnold provided physician letters notifying them that she had

conditions that *can be* disabling, that she took twelve weeks of leave in order to

address those conditions, and that she requested accommodation for those

conditions upon her return.  In light of these facts, Albertson's argument for

summary judgment on the basis of inadequate notice fails.

Albertson's next argues that Arnold cannot show that she was "doing [her]

job well enough to rule out the possibility that [s]he was fired for inadequate job

performance."[85]  As discussed above, however, a genuine issue of material fact

exists regarding whether Arnold's performance before the reduction in force was

satisfactory.  She points to evidence suggesting that one of Albertson's primary

complaints against her – not paying rent – was a pretext[86] and that the company had

offered an innocuous explanation for her removal from the other project about which

it complained.[87]  Moreover, she raises questions regarding Mumford's influence on

_____

[84]     *Id.*

[85]     *Sengupta v. Morrison-Knudsen Co., Inc.*, 804 F.2d 1072, 1075 (9th
Cir. 1986).

[86]     Deposition of Rebecca Arnold, Docket No. 19, Attach. 3 at 189–90.

[87]     *Id.*

**Memorandum Decision and Order – Page 22**

the ranking system upon which Albertson's relies.[88]  Thus, Arnold has raised a genuine issue of material fact regarding her performance.

Finally, Albertson's argues that Arnold cannot show that her disability or perceived disability motivated her termination.  Albertson's asserts that Bill Arnold's low rankings of Arnold motivated her termination.[89]  Although a jury could decide this question in Albertson's favor, it could also decide it in Arnold's.  Arnold has introduced evidence suggesting that her leave – which she took to address the problems from which her alleged disability arises – angered Mumford[90] and that Mumford may have influenced the subjective rankings upon which Albertson's relies.[91]  In other words, she has plausibly argued that the rankings reflect animus regarding her disability.  Further, the timing of Albertson's decision to include Arnold in the reduction in force is very much an open question.  If Albertson's decided to include her in the reduction in force shortly after she presented evidence

---

[88]     *See* Pl.'s Resp. to Mot., Docket No. 23 at 8; Dep. of Bill Arnold, Docket No. 19, Attach. 7 at 16.

[89]     Def.'s Mem. In Support of Motion, Docket No. 19, Attach. 1 at 5–7.

[90]     *See* Dep. of Rebecca Arnold, Docket No. 19, Attach. 2 at 99.

[91]     *See* Dep. of Bill Arnold, Docket No. 19, Attach. 7 at 16, 54; *Liu*, 347 F.3d at 1136–37.

**Memorandum Decision and Order – Page 23**

of her alleged disabilities, Arnold's disability claims would be strengthened.[92]

### C.      Intentional Infliction of Emotional Distress

Albertson's makes two arguments regarding Arnold's intentional infliction of emotional distress claim.[93]  First, Albertson's asserts that the symptoms of emotional distress to which Arnold points all existed before Albertson's allegedly wrongful conduct.  Second, Albertson's asserts that its conduct in terminating Arnold's employment was not extreme or outrageous enough to allow Arnold to maintain a claim.

Albertson's first argument fails.  Although Arnold acknowledged that she had suffered from nightmares, sleeplessness, post-traumatic stress disorder and depression prior to her employment at Albertson's, she points to evidence that Mumford's behavior triggered a recurrence of post-traumatic stress disorder as well

---

[92]      Of course, such timing would undermine Arnold's retaliation claim.

[93]      Although Arnold purports to raise a negligent infliction of emotional distress claim and Albertson's does not address that claim, the Court notes that Idaho Code § 72-209(3) appears to preclude such a claim.  It provides that workers' compensation constitutes the exclusive remedy for injuries resulting from negligent infliction of emotional distress.  IDAHO CODE § 72-209(3).  Accordingly, the Court shall grant summary judgment as to that part of Count III that asserts a claim for negligent infliction of emotional distress.

**Memorandum Decision and Order – Page 24**

as flashbacks and new nightmares.[94]  In addition, she was unable to continue

functioning after the copy room incident in May 2003 and felt she had to take leave

at that point.[95]  Arnold has adequately supported her allegations that Mumford's

behavior exacerbated her symptoms.  Accordingly, the Court denies summary

judgment based on Albertson's first argument.

Albertson's second argument succeeds so far as it goes.  The defendant is

correct that the way in which it terminated Arnold's employment does not satisfy

Idaho's high standard for maintenance of a claim for intentional infliction of

emotional distress.[96]  However, Arnold's claim for intentional infliction appears to

rest on more than Albertson's behavior with respect to the termination of her

employment.  Albertson's has not addressed its other behavior – primarily, the

behavior of Mumford, one of its Vice Presidents – of which she complains.

Accordingly, that part of her claim remains.

### D.    Wrongful Discharge and Breach of Implied Covenant of Good

---

[94]    *See* Dep. of Rebecca Arnold, Docket No. 19, Attach. 2 at 82–83; Aff. of Rebecca Arnold, Docket No. 24 at 2.

[95]    *See* Dep. of Rebecca Arnold, Docket No. 19, Attach. 2 at 90.

[96]    *See Edmondson v. Shearer Lumber Prods.*, 75 P.3d 733, 741 (Idaho 2003) (noting that conduct must be "atrocious and beyond all possible bounds of decency" to allow a claim for intentional infliction of emotional distress).

**Faith and Fair Dealing**

For the reasons stated in Section II relating to the FMLA claim and Section II.B. relating to the ADA/IHRA claims, the Court denies summary judgment as to those parts of Count II, for wrongful discharge, and Count IV, for breach of the implied covenant of good faith and fair dealing, that involve disability and FMLA leave. As discussed above, the Court grants summary judgment as to that part of Count II that involves age.

## Conclusion

The Court DENIES Albertson's Motion to Amend the Record (Docket No. 45) and GRANTS IN PART AND DENIES IN PART Albertson's Motion for Summary Judgment (Docket No. 19). The Court GRANTS the motion as to that part of Count II involving age discrimination, as to those parts of Count III involving negligent infliction of emotional distress and intentional infliction resulting from the termination of Arnold's employment, and as to that part of Count VI alleging sexual harassment based on hostile work environment. The Court DENIES the motion as to the remaining parts of Counts II, III, and VI and

as to Counts I, IV, and V.



DATED:  **November 9, 2006**

Honorable B. Lynn Winmill
Chief U. S. District Judge